Good morning. You've been on this case for a long time, haven't you? It's been a long road to get here, Your Honor. You know, life is one journey. Some are long, some are short. Verna Weefal, on behalf of Appellant Bobby Joe Maxwell. The State courts that have rejected Mr. Maxwell's claims over the years have rendered decisions that are both contrary to clearly established United States Supreme Court authority and an unreasonable application of the clearly established United States Supreme Court authority and the facts. This is a case, well, what is that clearly established Supreme Court authority? Chambers v. Mississippi, the right to present a complete defense, which came down in 1973. Grady v. Maryland, we all know what Grady is, 1963. Mr. Maxwell was convicted on very weak evidence of two counts of murder. This is a case where the prosecution worried and worried a lot prior to going into trial that this was a very weak case. The two counts in which he was convicted, the Jones count and the Garcia count. On the Jones count, the only evidence against Mr. Maxwell is a preliminary hearing testimony of the eyewitness who identified Mr. Maxwell at the preliminary hearing solely on hearing him speak in the courtroom and said that that's the voice of the killer. This gentleman, his name was also Joe. Kennedy. Try to keep your voice up. You drop your words towards the end. Weefal. Oh, I'm sorry, Your Honor. Kennedy. I do the same. Weefal. In any event, in terms of the Jones case, he identifies him by the voice of the killer. But he did not identify Mr. Maxwell in a lineup, and he gave a description of the killer that Mr. Maxwell did not hear. This individual also listened to a tape recording from a radio station, which somebody called in and said, I'm the Skid Row Stabber, and he identified that voice as the voice of the killer. Before the preliminary hearing was over, the prosecution got Mr. Maxwell, by court order, to give a voice exemplar. Police testing confirmed that the voice of Mr. Maxwell and the voice on the tape were not from the same person. The radio call. Pardon me? You say the tape. You mean the radio call? Yes, that's right. The radio call. Those results were not turned over, even though the police knew them two days before the preliminary hearing ended. Four years later, when Mr. Maxwell. We know all this. I'm sorry? We know all this, so. Okay. You know, you don't get much time here, so you want to go right for the jugular. Then perhaps then I would entertain questions. Does the Court have any questions? Yeah, well, all right. Let's go to the questions. Okay. Yes, please. So let's talk about Mr. Storch. Yes, please. I want to talk about Mr. Storch. Let's talk about Mr. Storch for a few moments. Yes, please. So as I understand, we have to look at this case through the lens of Ed Powell, as you started out, right? And with respect to his particular claim against presenting false testimony, is the claim here that the Superior Court's subsequent hearing, you know, the Cal Supreme Court remanded it back. Right. I sent it down to the Superior Court to conduct an evidentiary hearing. Conducted a hearing over two years. Now, is it your contention that the Superior Court judge's findings in connection with that hearing as it relates to Mr. Storch? I'm sorry. The Superior Court judge's findings, after all the evidence was presented, that those findings were an unreasonable determination of the facts. That's correct. Okay. And the clearly established law which those facts sort of governed what the Superior Court judge was looking at was what? Brady? And or what's the other one that goes with it? Brady and Napier? Well, you know, this Court has held and granted habeas petitions under the AEDPA where the false evidence that came to light after the prosecution or after the conviction that's the Hall case, Hall v. Director, and the Killian v. Poole. Please keep your voice up. Maybe I'm a little lost. I'm sorry, Your Honor. Keep your voice up. I'm sorry, Your Honor. And a little passion, too. Okay. Yeah. In any event, Your Honor. You're saying this Court's found other cases and other habeas cases has found situations where false testimony generated our granting of a habeas petition. Is that right? That is correct. But not in the face of a Superior Court hearing where they determined, the judge determined that there was no false testimony, correct? But the problem with the Superior Court's finding is that all of the evidence that shows that Storch lied was the ultimate conclusion of the judge. And what you have to consider is what would a jury have thought had the jury heard all of this evidence? Well, no. See, that gets to the heart of my question. Okay. Which is we're bound by AEDPA, right? Okay. So in order to overturn, we're told that we're supposed to give deference to Superior Court fact-finding, State Court fact-finding, right? That's correct. Under AEDPA, correct? Even before AEDPA, you're supposed to give. Now, we deal here with a situation where in one of our cases, Taylor v. Maddox, we talk about intrinsic fact-finding. That is, we're looking at the facts that were before the Superior Court judge, right? So your claim is that the Superior Court judge's ultimate determination, either that Storch didn't lie or that Norris, the DA, knew that he didn't know that he was lying, was an unreasonable determination of the facts. Now, so you don't – so we can't say that he made those findings without giving Storch – you know, this is one of those rare cases where the State did give a hearing. And we can't – it doesn't look like we can say that the Superior Court judge didn't understand the law that he was looking at. So then what we're really looking at is the evidence, the evidentiary record that was compiled before the Superior Court judge and saying – and you're asking us to say that his ultimate findings was an unreasonable determination of all the evidence that was presented to him. So I'm asking you, what is in the evidence there? What is it that the Superior Court judge overlooked, disregarded, didn't pay any attention to, or, you know, just willy-nilly just said, you know, I'm not going to consider that, or whatever? What the Superior Court overlooked and didn't pay any attention to is the – all of the facts that were really ultimately undisputed leading up to the conclusion that the Superior Court gave. It was not – it came out at the hearing, and it was undisputed, that Storch was an undisclosed heroin addict at the time that he testified. It came out that the deal that he testified, that he – when he got on the witness stand, he said he had been given a 16-month deal. It had already been given long before he overheard this disturbing confession, and it turned out that, in fact, that that was not the deal that he had been given. He had been given a three-year deal. His public defender got on the witness stand at the habeas evidentiary hearing and said that he would not have gotten a 16-month deal had he not gotten this private attorney to approach the prosecutor and had he not testified. That was really undisputed. It was undisputed that there were numerous police officers at the time that Mr. Maxwell was going to trial and that Storch testified that used him as a police informant. It was undisputed that he had been a police informant, and that had not been disclosed. And it was also undisputed that Mr. Superior Court – Well, wait a minute. That had not been disclosed to the trial judge, the superior court judge, that he had been used extensively as an informant in the prison? It had not come out at Mr. Maxwell's trial that Storch was an extensive jailhouse informant who testified in court. It had – but that – his history in Los Angeles – Well, look, let me tell you something. Yes. See, I've got here this – Judge Steve Trott is a colleague of ours, as you know. Maybe you don't know that. He was the deputy attorney general in charge of all the attorney generals in America. He also ran the DA's office. Do you know Steve Trott? Oh, yes. I've appeared in – I've had the pleasure of appearing in front of him many times. Now, he – back in 1996, he wrote a law review article, huh? Yes. A lot said about Storch. In 1999, in the Marshall Law Review, there's a whole big section just on Storch. I didn't realize he had written about Storch. Well, why don't you look it up? You know, it's easy to find. And he was a notorious, notorious informer for the police. And Judge Trott – well, at least – I haven't read this article, but he had his first trial before me when I was a municipal court judge, and he'd just started in the DA's office. But he told me how these things work, how these informers work. And he's gone around the country to U.S. attorneys all over and to Harvard and all these other places lecturing on the dangers of using these professional informers. And Storch is a classical case. The way all this works. And did you bring that up? You know what, Your Honor? The articles that I read that Judge Trott wrote were about Leslie White, who was a cohort of Mr. Storch. Yeah. I'd be happy to look at that. But at the time that Mr. Maxwell went to trial, this was before the jailhouse informant scandal. This was before the grand jury investigation. And there was a lot of work on coveralls. Storch testified, I think, as a professional informant, and somewhere that's in here, between 120 and close to 200 cases. Did you know that? Oh, of course, Your Honor. I've been intimately involved. But did you make the judge aware of that? You know, I cite some of Judge Trott's opinions in my brief. Well, I know you did that. This jailhouse informant stuff did not come out before Mr. Maxwell's jury. But did that fact appear in your papers in front of the superior court judge? Oh, absolutely. Multiple times. Hundreds and hundreds of pages. That Mr. Storch was a professional informant. I mean, quote, unquote. Oh, absolutely. And not only that. I mean, I am probably one of the only attorneys at the time that was able to get into all the grand jury records, all the stuff about Storch. Many of the witnesses that testified at the habeas evidentiary hearing, I was able to find them because of the grand jury records. This was probably the most full-blown evidentiary hearing about this scandal that there was. And all of the evidence that came out about Storch's background, about his subsequent life, the superior court did not disagree with those facts. He acknowledged that, correct? He did. He did. He just said, but in 1984, when Storch testified, whenever he testified, was it 1984 that he testified? It was 1984. That's correct. He said that, well, in this case, he didn't lie. Now, what's wrong with that in light of all this? There's a lot wrong with that. There's a lot wrong with that. All right. What is it? Answer this question. What's there to say that he didn't lie? First of all, he clearly lied about his motivation to testify. When he came and testified against Mr. Maxwell, he said that Mr. Maxwell was having trouble getting a shower. I got him a shower, and he became so grateful for me, to me, that we, for three weeks that we were in the same cell together, we stayed up late at night and we talked, and we became rather close, he and I. And thereafter, a newspaper article was passed into the cell, and Maxwell pointed to that newspaper article and said, that's where I made my mistake. I forgot to wear gloves. And I was so shocked and disgusted that I had a long talk with my rabbi, and I came in here to talk. Now, I'm getting a deal for 16 months, but this deal is already in the works. It has nothing to do with my testimony, and that's why I'm here, and I'm just a nonviolent forger. But in fact, this is who Sidney Storch was. He was a heroin addict. He had been a police informant for many years. He was kicked out of the United States Army for being a habitual liar. He was known by every police officer that had arrested him on the cases that he had gotten a deal for for being a liar. One of them from Bunko Forgery decided not to use him anymore because he offered to give phony checks and plant them on somebody so the police could arrest him, and they said, we don't want to get involved in framing somebody. He was not in the same cell with Mr. Maxwell for three and a half weeks. The housing records from the sheriff's department, which I had a hard time getting, mind you, afterward, show that they were only in the same cell for four and a half hours. The sheriff's deputy that supposedly gave Mr. Maxwell a shower never spoke to Mr. Maxwell about whether he needed to get a shower, and in fact, if we had the habeas evidentiary hearing, the district attorney found this deputy sheriff, and thank God he is an obsessive compulsive because he said he had his notes from when he was working in the module that day. I said, you had your notes? Yeah, here were his notes.  And when did he give Mr. Maxwell a shower? At the exact same time that those housing records show that they shared a cell for four and a half hours. So the jury never heard any of that, and the public defender testified that Mr. Storch would not have gotten a 16-month deal had he not testified, so that was clearly false. All of this stuff is false. Now, we go on, look at Mr. Storch's career afterwards. He repeatedly testified for the district attorney's office. They conceded that he was a liar, ultimately. He was indicted for perjury in the case of Sheldon Sanders, which was also a high case, and he, you know, they just basically threw up their hands and said, yeah, this guy is a big liar. The United States Supreme Court in the 1950s, Mezirash versus the United States and the Communist Party, a similar situation. There, we had, this was a federal case, but there were informants that were being used to testify against communists. They testified and they convicted all these people in the Mezirash case and the Communist Party case. They continued to use the same informant later on, and then they began to realize that this guy was a pathological liar. He lied about everything under the sun. So they went and they conceded that the guy was a liar later, but they would not concede before the U.S. Supreme Court that the guy had lied against Mezirash or these people in the Communist Party. And the U.S. Supreme Court said, come on. You know, do you think we're stupid? The United States Supreme Court is not going to, you know, allow a conviction to continue on tainted testimony. And that's what this case is. Anybody, anybody who would walk in here today, Mr. Glassman, and say that Sidney Storch, pardon me, did not lie, at least about his motivation. Does Storch's testimony affect both of the convictions? Pardon me? Is his testimony relevant to both convictions? Absolutely. I mean, it's still, because Storch was the guy that, I mean, confession, as they say, as the U.S. Supreme Court has said, is unlike any other evidence. And the prosecution's theory was that Mr. Maxwell had committed all of these crimes. And the only ones that he was convicted on were the ones that they had any evidence at all, which, as we know today, there was, the jury still did not hear all the exculpatory evidence. Mr. Storch was critical to getting those two convictions. And to allow this conviction to stand on the basis of Sidney Storch is just not right. What did he say about these two that led to the conviction? I'm sorry? You say Mr. Storch was crucial to the two convictions, not to the, what were there, eight exonerations then or whatever, the other charges that Mr. Maxwell was cleared of? What testimony did he give that was crucial? The two, as opposed to the X. Garcia. Garcia. He testified about the palm print, which was clearly the Garcia case. You said that Maxwell. The what? The Garcia case. The Garcia case. But that news article that was introduced into evidence talked about the fact that Mr. Maxwell was accused of being the Spidro stabber, that he was accused of having committed 10 homicides, and that the evidence of one of them was this palm print on the park bench. And Maxwell supposedly said to Storch, you know, looking at the newspaper article, boy, I hate being reminded of that one case is where I made my mistake. So when the jury heard all of the evidence and rejected it and did not convict him of those other counts, the Garcia count, which was the palm print, and the Tom Jones count, Tom Jones was the only other case where the jury really heard any evidence to incriminate him, which was the preliminary hearing testimony of the witness saying that that's the voice of the killer. There's no way that Storch did not push this case over the edge to help the prosecution win the two convictions. All right. I just have one little background question for you. Sure. Does the exception of record contain all of the testimony that was before the superior court judge in that evidentiary hearing? It contains all of it, Your Honor. All of it? Yes. Is there something that you're not sure about? Yes, yes. I gave the court, you know, we're always torn between the court is always telling us we have too many excerpts, the briefs are too long. I gave it all to you. Okay. Well, did the trial, was the jury made aware of the modus operandi of Storch, how he operated? No. No. You mean about being the snitch professor and how to fabricate? No, no. We know that one of the things that he would do, he would make arrangements to either get on the bus with the defendant, the person he's snitching on, or make other arrangements to be in proximity with that person so he could make up his story about a confession. We also know, if you read this, and I heard about this a long time ago, that he had access to a telephone and he would call, say, for example, the coroner's office, posed as an investigator who was trying to complete his reports, but who didn't have, his memory was unclear as to the point of entry and exit of the bullet, and he'd get that from them. This was information that was not in the newspapers. And then he would call a DA on the phone and pose as a police officer and get additional information and then present this to his handler, and all to show that he knew about how this crime was committed beyond what was in the newspapers to give him credibility. And was that presented to the judge? No, it was not. Another thing that bothers me, and then it goes on from there, and he had no conscience, he enjoyed seeing people convicted and go to prison, and he was very skilled. And the other thing that I'm also wondering about was at the time of the preliminary hearing, the prosecution knew about the fact that Jones' identification of the voice of the killer was just absolutely, well, was not supported by the experts who compared the radio tape to a voice exemplar of Maxwell's. So that information was not known to the defense attorney at the time of the preliminary hearing. No. Even though it was known to the state. The state did not. You know, here's the thing I want to ask you. I have a lot of experience with preliminary hearings when I was a municipal court judge. And, you know, the standard of degree of persuasion is very low. All you have to show is that there's an offense was committed and that there's a suspicion that the person before the court was the person who perpetrated the offense. Very, very low standard. Now, most defense attorneys, they don't put on any defense at the preliminary hearing because it's a waste of time. And they're mainly just to get information. But here, if counsel would have known about this, the experts report on the voice identification certainly could have used it. And then to say, and then Jones died. He died. I don't know if he was killed or what. But he died. And then at the trial, the judge lets in his statements at the preliminary examination and says they're reliable. But they weren't subject to cross-examination. The whole nature of a preliminary hearing is for the defendant, as far as the defense is concerned, to learn as much as the defense can learn. They're not out there to try to get a victory. So did you make that argument? Yes, I did. I did, Your Honor. You're very smart. When did Storch begin his career of testifying? He began his career in testifying in Los Angeles with Mr. Maxwell's case. He ended his career. I mean, that's the first case he testified in? Yes, in Los Angeles. Los Angeles. He had some prior activity in New York. I was never able to determine if he had actually testified in New York. But he had been an informant, a police informant, since he was a teenager. In fact, his brother, Fred Storch, testified by video deposition and his declaration that he had been a heroin addict and had worked as a police informant since he was a teenager, basically. He clearly had a lengthy history of being a police informant, which the police officers who testified at the habeas hearing, he was well-known at that time. But he testified here. This is where he began his career then as an informant, in Mr. Maxwell's case. Yes, and his last case was the Sheldon Sanders case, which was also my case. I won that one. But because he was indicted for committing perjury about the Maxwell case. Yes, but look, you know, the fact that he was able to get a shower from Maxwell, the fact that they were in the same cell, even if it was a brief period of time, the fact that he was able to make these calls, all of that certainly points to someone who is getting help on the inside of the prison, doesn't it? Well, there were two police officers. Well, I mean, how do you go in the county jail with 20,000 people or 15,000 maybe they had back then and say, oh, I want you to do me a favor and give this guy a shower. You know, you've got to have some clout. Well, one of the things that was clearly – Or how do they – they always get together in a van. You know, the sheriff used to have a good bumper sticker on the back of all of the vans, and the bumper sticker read, another family against crime. But the sheriff's a good guy here. But this hearing went on for over two years. I mean, the hearing before the Superior Court. It was more than that. It was at least two. You said it went on for more than two years. Yeah, the hearing was – we had more than 30 witnesses testify. Most of them were law enforcement officers. There were lots of documents, which I had given the court. So the judge heard exhaustive evidence and reached a conclusion that you don't like. Who was the judge? You know, again – Who was the judge? There's always going to be differences of opinion, but again, I think it's reasonable. But, you know, we also have the Brady claim, because the California Supreme Court remanded on the false evidence claim. And when I went back to the California Supreme Court, I argued Brady again because of the failure to disclose all of this stuff, which by now there was no question of what the evidence was that had been failed – that had not been disclosed. That was really not in dispute at that point.  But the business about the voice recognition and the expert – that was all – Direct appeal. That came up at the trial, though, didn't it? The issue regarding its exclusion came up at the trial, and I argued that in the direct appeal, and the court of appeal ruled on that. And that decision is also contrary to and an unreasonable application of the facts. And I think I must be running out of time. But I have to say, one last thing I do have to say about exculpatory evidence is that the fact that Gary Stinson, the man that Mr. Maxwell contended was the real killer in this case, and who had been arrested at the crime scene right when the body was discovered, not only was he not allowed to tell the jury that he had been arrested at the scene of the crime, but the prosecutor said in closing argument that Mr. Maxwell's – Mr. Maxwell's defense that Stinson was the true killer was a smokescreen, because there wasn't any evidence that he was at any of the crime scenes, and that was a lie. Good morning. May it please the Court. David Glassman for the Respondent. I will address the storage claim. I will also address the voice print analysis. But the first issue I'd like to talk about has to do with why neither of those claims belong here and the case doesn't belong here. And the reason for that is that you have just heard in a short period of time Petitioner's counsel explain the theory of the case, and as best she can, the theory as to why there is an AEDPA violation in the superior court's denial of relief. And she knows the case, obviously, inside and out, because she has represented the petitioner for the better part of 25 years. And the reason that that is relevant is that there is a delay in this case. And like the previous cases that the Court has heard today, the delay triggers the statute of limitations and all the problems that the Court regularly encounters in the AEDPA statute. But the delay here is extraordinary for several reasons. First of all, and Judge Pai, as you asked earlier, about whether or not someone was unrepresented, because typically, overwhelmingly, that is the case in these cases. That is, either there is no attorney or there is an attorney who is new to the case or handles a portion of the case or handles a state appeal but not the federal appeal or no state law but not federal habeas, et cetera. This case is unique in that the same lawyer has represented this defendant throughout the entire state and federal appellate and collateral litigation in this matter. And so it is under the AEDPA his burden to explain why, following the state court's denial of relief, a denial which you have been told on its face is unreasonable, is an unreasonable application of the facts and a Supreme Court precedent, why from that date forward there was no ---- What are the rules for filing a habeas petition in the California Supreme Court? The rules are that it's ---- Can you just file like a little two-page kind of summary kind of petition that says this is my petition? Well ---- It's unreasonable, but the Supreme Court did. Theoretically, you can certainly and the petition will be filed, but the question is whether or not the court will, that court, will determine that delay has been explained or subsequently ---- So does the California Supreme Court have sort of basic rules and guidelines for filing a petition for habeas corpus? Yes. The California Supreme Court ---- What do they expect attorneys to do? They expect attorneys to file ---- I'm not sure if we're talking now about what the attorney has to do vis-à-vis the merits of the claim or ---- I'm talking about the ---- So here we have here a situation where the California Supreme Court remanded to the Superior Court the claim about Storch to conduct an evidentiary hearing. Right? Correct. And they said you decide the case. Correct. Right? So it goes back to the Superior Court. They conduct a two-year ---- It takes two years. Why it took two years is beyond me, but it took two years. Right? So the petitioner loses. Yes. Okay. Before they can come to our court, they've got to make sure everything is ---- Exhausted. Exhausted, so they have to go back to the California Supreme Court. Correct. Now, I'm just asking you, at that point, what is ---- what does the California Supreme Court expect a lawyer to do or a petitioner to do? They expect you to file a petition setting forth the operative facts and the ---- And you have to support it with your documentation and all the other stuff that goes with it? Yes, Justice Breyer. Let me ask you this. At the end of that hearing, did we have the transcripts of the hearing? Counsel would have to. I'm asking you. I'm not asking her. Did we have the transcripts? Were the transcripts of that hearing available shortly after the Superior Court rendered its decision? Your Honor, all I can tell you is that I have never seen in the case an argument that it was the inability to obtain a record that explained the delay. The argument has been ---- The Superior Court ---- the district court judge here said that in light of all ---- of the complexity of the issues at the Superior ---- before the Superior Court in the length of that hearing, the evidence that was submitted, the documentation, that it was understandable and reasonable for Petitioner's counsel to take the time that she did to file a complete habeas petition in the California Supreme Court. I understand that she ---- that they prevailed on this point. That's what our district court judge said. And the district court made that ruling also at a time when the case law was different than it is today with respect to interval tolling. Didn't he take another look at that issue? Yes. And ultimately, we are entitled to appellate review of that determination. And my point simply is that where you have an expert representing you and the same lawyer involved all the way down the line and a lawyer that has a very clear argument as to what's wrong with the case, and we can say whatever we want about the state court evidentiary hearing ruling, it was a denial. That's what it was at the end of the day. They knew what the evidence was. It was a denial. So to say that it would take 14 months reasonably over a year after that to file a state habeas petition, I submit is something that has to be evaluated if the statute means anything. Well, you had a hearing that lasted how long? Well, Your Honor, the hearing did not ---- Years. No, the hearing did not last two years. The hearing took place within a period start to end. How thick was the transcript? I don't recall the length of the transcript. There were over 30 witnesses that were called, which is another indication once we turn to the merits that there was a full and fair hearing given in this case. This is not a postcard following no hearing. This is a lengthy evidentiary hearing. Something about delay now. Yes. You've got a huge, huge record. It takes time. Everybody took time on this. The State Supreme Court, what did they take, a couple of years too? There was a ---- The State Supreme Court had this case for a number of years. That is correct. Yeah, a number of years. And then this hearing took place over a two-year period of time. Well, as I said, if you add up the time ---- It takes her 14 months to do it, something as complex as that. Your Honor, the case was well ---- You just don't go in there and file your petitions and your authorities and all that from memory. I mean, if the lawyer did that, I only know one or two lawyers that probably could have accomplished that because they have not only photographic but photogenic memories. And that was funny, you know. I liked it. He liked it. And so I don't see that as unreasonable delay. Well, very well. Then once we turn to the merits, the question is, after such a prolonged hearing, after evidence is taken on all of these claims, whether or not it is unreasonable, unreasonable in light of the Supreme Court precedent and the facts presented. Now, one can relitigate or attempt to relitigate the credibility of Storch for 20 years. But his lack of credibility, the guy is a liar. Everybody knows it. And they had to know that if this was his first one here, they had to know that, too. Because otherwise, how did he get people in the shower? How did he get into a cell with this particular person? How did those meticulous records or ambiguous records that they were together, one set four and a half hours, another set weeks, how did all that happen? And how was he able to make calls out to law enforcement and get information? As I think Petitioner's Counsel has acknowledged. I think the whole thing, as a friend of mine used to say, smacks of collusion. He got help. He got help from law enforcement. Your Honor. Because these informants were just used wholesale. Your Honor, my evaluation of the case. You know that they were used, don't you? I certainly know that. Are we using them still? Well, are informants used? There are policies, it is my understanding, there are policies in effect in 2009. Yeah. And soon to be 2010 when this case will be in its fifth decade of litigation, that were not in effect in 1979 when this Petitioner was at large. Well. Should have been in effect in 1979. And as I think in response to Judge Mahan's question, Petitioner's Counsel. But, you know, 1979 is not so long ago. Well, it is for one case, Your Honor. It is for one case. I'm still working on a case that I got in 1972. It's been the joy of my life. Your Honor, when, as was indicated at the evidentiary hearing, and as was acknowledged today, there were no previous cases involving Storch in this district attorney's office. Yeah, but they had to know. They had to know he was a good professional informant. Otherwise he could not have operated as he did in the county jail. What you're saying is he had no history at that point in this case. Not only am I saying that, Judge Mahan, I'm also saying that what he knew and what was done in all these procedures are ultimately based on the record in this case, not information that others have gleaned from other cases or writings or publicity. This is what's all kept secret. Well, if there was a... They're not posting a list of professional informers in the Daily Journal every day. Your Honor, in this case, there was specific testimony about specific allegations relating to Storch. And those specific claims were addressed by Judge Rapay sitting as the fact finder. And, for example, when Judge Rapay found that, in fact, there could have been the sharing of a cell based on all the information that Judge Rapay heard and the jail records, the judge points out that it is not rebutted, that it could have happened. And the Petitioner introduced no evidence in that... Did he find? Did he make a specific finding that they actually shared the cell for 23 days or 21 days, whatever it was? The finding was that they may, if I'm... Well, what kind of finding is that? They may have. Well, the question, Your Honor, is what did the evidence show and did the evidence... Well, the question... Well, so there was evidence... It's a finding. You've got to resolve it. Usually... Usually there's a finding. They resided together in the same cell for 21 days. And here's the evidence that supports that. Or they didn't. You don't make a finding, well, they may have. What does that tell you? Nothing. Well, the issue before the court was whether the Petitioner had carried the burden on the allegations. And the court found that the Petitioner had not. And that is the... Not only did the State Superior Court... They've got to do it by clear and convincing evidence, right? Correct. Yeah. Now, is that a fair burden to put on a defendant? Whether it's the... Clear and convincing evidence, huh? If that is the legal burden, Your Honor, it's not up to me to change it in this case. No, but is that a fair burden? Who has got access to the evidence? Who has got the resources? There is no claim... Who is best able to garner the evidence? There is no claim in this case. And isn't it the prosecution's duty to determine the truth? Isn't that their job? Of course. Yeah. I mean, I read about it all the time. There is no claim in this case that relevant evidence regarding housing or any other matter was suppressed in this proceeding. Well, then why was that Brady information suppressed that was in possession before the preliminary hearing? Why wasn't that given to defense counsel? Are you referring to the exemplar? Yeah. Well, the lack of an exemplar is addressed not only in the direct appeal, but in the state habeas corpus proceedings. Well, you tell me why. Well, first of all, Your Honor, there has been no determination that there was any bad faith in this case. What does that got to do with it? You know, hey, I've got all this evidence here, but I don't think it will help you, so I'm not going to... Your Honor, there's also a finding in the case that there's no indication that the exemplar is admissible evidence in the first place. So... Why wouldn't it be admissible evidence for impeachment? Why wouldn't it be? Because there are any number of reasons why it may not be. It may not rise to the level... I think it was Jones, yeah. He gets up and testifies that he heard the voice of this person who came with a cap on and, you know, and had this kind of a limp and tells what happens over by the library. And he sees him walk away and he heard his voice. And then he listened to the tape from the radio broadcast, a phone call to the radio station, and he said, yeah, they're the same person. They're the same person. Well, the experts on this subject said, no, it's not the same person. Well, to say that they're experts, number one... Well, they were... Didn't... Who employed them? The defense... I don't remember who... Well, the state employed them. But first of all, Your Honor, if we... If ultimately in this case the state court found that it was not admissible evidence as to whether or not that comparison would have been allowed in the first place. So we're proceeding on the assumption that this is admissible, exonerating evidence. But that doesn't mean anything. It can be exculpatory. It can be used for impeachment. You know, now maybe... So you have to turn it over. You know, you don't make... The prosecutor doesn't make the decision as to whether when you have this conflict, you are or are not going to turn it over.  I'm not arguing that, Your Honor. My point is that there are rules of admissibility that govern evidence, whether it's evidence that's used in a case-in-chief or an impeachment. And the state court is aware of that. You don't know what the ruling's going to be until it's made, you know. And, you know, what was the ruling here? It's like our 403. Oh, it's too burdensome. It's going to be a distraction and, you know, all that. Well, you know, it's kind of a cobbler. I see that my time is up. Well, I've got a few questions for you, sir. All right. So let me ask you this. We'll give you all the time you want. So after the... I've had the time I want. I know. But, you know, this is a fun... So after this evidentiary hearing before Judge Rappe, it all comes out, a great deal of evidence comes out that Storch is basically a liar. Correct. And there's... They point to incidents that happened after his testimony in Maxwell's trial. Yes. Why doesn't that bear upon his, you know, his credibility or believability at the time of the trial and when he testified in Maxwell's? So the state, I mean, the DA's point, and they say, yeah, he was a liar. That guy just lied. It turned out he was just a lying snitch. Well... Why doesn't that bear on what he did in Maxwell's case? Well, there are several answers to that. The first is, and it's said, you know, always sort of in a by-the-way fashion in this case, the first is the petitioner is charged with ten murders. He admits, Storch claims, all of them to Storch. He's convicted of two murders. So the jury acquitted him of 80% of what he was charged with. So ultimately, whether or not and how it mattered to the jury, that's always the speculation that we engage in in retrospect. But the fact of the matter is, obviously, the jury was not... We don't know. We don't know. I mean, there may have been a compromise that was worked out. We don't know what happened in that jury room, do we? No, and we don't ask what happened in the jury room. Ultimately, we ask whether or not on the case as a whole... Well, the prosecutors talk to the juries after it's over with. All right. Let me return to your point, then, if I could, Judge Pius. So the question also is, and these are, after all, if you will, there are frameworks that we are told to evaluate these claims in light of, and one is the Nepew claim here, the knowing use of false testimony. So if we go back, as you suggest, and talk about this history that emerges later and conduct that happens years after this case, I would submit to you that in no way establishes or even indicates... Is that pretty powerful evidence? Of a knowing use, Your Honor? No, no, that he lied. I'm not talking about Sterling. I'm talking about Mr. Storch. I understand that. Why isn't it just a reasonable inference, based on what we know later, that he lied when he was on the stand? So let me go back, then, if I could. And, in fact, whether Mr. Sterling knew it or not, he ended up presenting false testimony. Well, now, there are two things, though. Because there are, whether we like it or not, there is, we have to look at this in light of what the Supreme Court precedent that governs the claim is. If it isn't a knowing use, and I understand that it need not be, but once that part of the claim is gone, we're no longer arguing, apparently, now, whether or not there was a knowing use. There's no evidence. I mean, I'll put that aside for the time being. All right. So then the question is the failure to disclose information that, by definition, had to have been known then. It had to have been capable of disclosure then. So the point is, what was available in 1979, or up until the end of the trial in the early 80s, this is a nine-month trial, what was known then and was not disclosed, and for our purposes, conducting this review almost five decades later, what impact it had? And that, I think, is a much more precise inquiry than simply saying, well, we see in retrospect that this guy is a snake, and therefore, this case is invalid. And I think that is what the superior court was evaluating, as was the district court. What is the evidence in this case that allows that type of interpretation? To me, the evidence in this case that allows that kind of interpretation is the way Stork or Storch operated in the county jail right from the start, you know, where he gets the guy a shower and we're in the cell together and all that. You know, that doesn't happen unless the call is made by an officer to someone in the jail and says, this guy is there. You always try to get informers in with these high-profile prisoners. And so that, you know, why did they do that? I mean, he couldn't operate without outside help. He couldn't make phone calls. He couldn't call a coroner. He couldn't call a deputy DA and act like he's a police officer, get all this and everything else. I mean, that tells me that right from the start that they knew what they had on their hands. Let me ask you this. Who was the district attorney while this case was being tried? Not the trial prosecutor, but the elected district attorney? Yeah, yeah. Well, I would imagine it would be John Vandekamp. Yeah, well, I'd like to have you talk to John about this. You'd get a piece of his mind, you know. And, yeah. I'd like to make one other point, Judge Pragerson, in response. Who was John Vandekamp's top assistant? Well, at one point it was Johnny Cochran, Your Honor. That's right. You know it all. Yeah, okay. Johnny Cochran. Well. I'm sure Johnny didn't know either. What point did you want to make? Thank you, Your Honor. Judge Pragerson, you indicated, if I understood you correctly, that Thomas Jones was not cross-examined at the preliminary hearing. No, I didn't say that. Well, and that's why. No, no. No, I'm sure you're going to ask some questions. But the most important bit of cross-examination that the defense counsel could have used would have been the results of that analysis of the exemplar of his voice, of Maxwell's voice, and the voice of the person that called the radio station. And the state knew about it. Well, in light of that observation, Your Honor, I would like, finally, to note just a few of the subjects about which Jones was cross-examined and impeached. At the preliminary hearing or at the trial? He had died at the time of the trial, Your Honor. At the preliminary hearing. So at the preliminary hearing. That's right. That allowed the admission of his testimony. He was cross-examined about the fact that he had the opportunity at several pretrial lineups to identify the petitioner, and he did not. He did not. All right? He was cross-examined about the fact that he wore glasses and was nearsighted. He was cross-examined about the fact that this murder occurred in a dark area, and he couldn't fully see the killer's face. He was cross-examined about the fact that he saw the killer for less than a minute and maybe as little as 30 seconds. He was impeached with the fact that he originally described the killer as 6 feet tall and 200 pounds. The guy was 5'7". You're close, Your Honor, 5'8", 150. Well, he shrunk by the time he died. He is abusing a narcotic or some sort of inhalant. Vicks inhalant. That's right, Your Honor. And finally, that the first time he identifies the petitioner as the killer is when he sees him in court in the preliminary hearing. So as compared to that list, with the admissibility or inadmissibility, I suggest, of someone who is going to claim to be an expert on a voice called in to a radio station, there was extensive cross-examination and extensive impeachment of him. Yeah, but wasn't that information about what Jones said about, yeah, the voice and the walk, wasn't that information important to the prosecution? Didn't they act on it? Well, I'm sure they considered it. He was pretty positive, wasn't he? I'm sure they considered it significant. They offered it. We are evaluating under Brecht v. Abrahamson the impact that it had, and my point is that there is far more probative impeachment and cross-examination. That's probably true, but there's still a big violation of Brady. Do you have any cases where testimony at a preliminary examination and the witness dies that satisfied Crawford? Yeah, it satisfies that. Do you have any cases on that? Do you understand the question? I do. Well, more. One case, that's all. I'm not thinking of one offhand, Your Honor. However, I think it is a fair statement to say that the principle involved, namely, that if there is an opportunity to cross-examine at the preliminary hearing and the witness subsequently becomes unavailable, that testimony is admissible as a matter of law. Yeah, but, you know, is there a case that holds that? I mean, to the attorney. That's constitutional. That goes far beyond a point of law. Yes. Do you understand the point that Judge Preggerson is making? I think if I can make it for you. Go ahead, please. I mean, because Crawford is constitutional, as you know. I'm not saying he's illegal. Yes, I understand. So the law says this, but, I mean, the law says a lot of things that we or some other court says, no, that's unconstitutional. And I think that's what Judge Preggerson is looking for. You can say you can use that as a matter of law, but do you have a case where that's been approved by a court? I think, and I would have to reread the case, but my recollection is that Barber v. Page recognizes the disability. That you can use someone's preliminary hearing testimony if that person subsequently becomes unavailable to testify at trial. That is correct. And that's not a Crawford violation. Well, Barber v. Page precedes Crawford. That's right. So, but, you know, in the context that we are in in this habeas proceeding, as the court knows, the question really is what case prevents it, not what case allows it. Well, yeah, but find me the case that allows it. You know, I just, I like evidence. Well, if the court would like, I'll be happy to send off the citations. Sir, I want to ask you about the last couple of cases that counsel raised with us by the U.S. Supreme Court. Meshirash, I believe it is, and the Communist Party case. What do you have to say about those cases? I understood counsel to be arguing those cases in a much more, how would you say it, in the general sense that there is sort of this tension between taking an untenable position in one court and doing something different everywhere else. I don't exactly see how that plays into this case, certainly within the AEDPA framework of this case, unless essentially what she is saying is that because this person at some point was discredited. And the DA and the prosecuting authorities recognized that the person was discredited. Then there was an obligation to not only renounce him, but disavow any reliance on any case in which he testified. That, because we are in this collateral context, that's an argument, to my knowledge, that was never made in this State court proceeding and could have been. So if that's a claim in this case, it must be an exhausted claim. And it may be an interesting argument, but I don't see how it's been perfected in this case. I thought what she was saying was that in those cases informants were used. And the informants testified falsely. Your Honor, as you know, the controlling principle in this case is what Supreme Court precedent compels this decision. And I'd have to look back over many years of litigation, but I don't know that there's been any sort of expressed reliance on that theory in the California Supreme Court, in the State evidentiary hearing court, in the Federal District Court. Reliance on what? Reliance on the case and the idea that I was asked about. So Messerage and the Communist Party case, they made their first appearance in this litigation when she filed her. I'm not saying that, Your Honor. What I'm saying is I would have to go back and do I recall that that was a claim raised in this case? No, I don't. And if I'm wrong in terms of a citation, so be it. But that is certainly, let's put it this way. When the State court writes a 34-page decision and identifies the issues that are there, that are presented by this petitioner with the same lawyer for 20-some-odd years, there's no discussion of a claim like that. And there's no indication to the District Court or to the State court subsequently, well, you forgot my most important argument. So the issue is not there. Well, the law is a living creature. You know, and cases are alive, too. And they're amorphous and they change, you know, from the first to the end. And the big change is when they leave us and they come back. And when they leave the District Court and they come back to the District Judge, he looks at them and says, I don't even recognize this case. Well, that's because he's retired by then, Your Honor. What? That's because in the case of this case, everyone's retired. Not me. Yeah. Well, then with that, I'll see you on the next round. Thank you. Thank you, Your Honor. Yeah. You know, I got a new I.D. card. And it shows date of birth, October 13, 1923. Expires 11-19-2004. So they know when you're born and they know when you're going to leave. That's the way that things work these days. I have nothing further unless you have other questions. No. Thank you. Okay. Well, it's been fun. Good arguments on both sides. We appreciate it very, very much. Very good. You've been very helpful.
judges: Mahan, Pregerson, Paez